Mr. Widenhouse. May it please the court, I'm Gordon Widenhouse and along with George Curran represent William Barnes in his appeal to this court. We ask this court to reverse the district court's determination that the state court's adjudication of the issue in this case regarding an external communication with a sitting juror was not an unreasonable application of settled federal law. There are three settled rules pursuant to United States Supreme Court decisions as this court has articulated in Fullwood v. Lee that deal with the issue in this case. First, an external communication with a sitting juror is absolutely prohibited. Second, an external communication for the prejudicial and third, an external communication with the sitting juror when that issue arises should be resolved by an evidentiary hearing. In this case none of those rules were followed. We know there was an external communication with a sitting juror. We know that that is considered presumptively prejudicial and Mr. Barnes was never accorded that presumption of external communication ought to be resolved by... Does it have to be with regard to an issue that's before the jury for it to be presumptively prejudicial? No, it simply has to deal with the case itself. The case itself in any respect? Yes. As long and of course you can make a determination after you figure out what the communication is about the potential effect of the communication but it element of the crime as long as there is the external communication with the juror and has something to do with the case then the presumption of prejudice attaches. Well, that's not what Rimmer says. Rimmer says it's about the matter pending before the jury. It's about the case, correct. It's about the case itself. There are a lot of things about the case. The two aren't necessarily synonymous. So what do you say was the matter pending before the jury? At the very least it was the appropriate sentence to be imposed. I mean we know that the guilt had been determined and the communication occurred during the state court sentencing hearing which is a jury determination in North Carolina and so it had to do with the sentence that was to be imposed. Tell us what your basis is to say that the communication based on what was before the state MRA court, what was the communication that was made before the jury and how does that relate to the matter before the jury? The communication with the juror was a discussion that she had with her pastor. So we know that's the talking that went on. That's the external communication. We know that she contacted her pastor because at least one of the jurors was hesitant about returning a death sentence in the case. Why do you say that was the reason she contacted her pastor? Because the affidavits in the case and statements in the case indicate that one of the jurors was concerned or hesitant about imposing the death sentence and that... But did the affidavit say that's why the juror, who I think was Ms. Hopkins, I think that's right, I may be wrong about that. Yes I believe it does. I believe the affidavit of Ardeth Peacock which is, which she was one of the jurors in the case and it's on page 1900 of the joint appendix. Her affidavit I believe indicates that Holly Jordan made the contact with her pastor because there was a concern about a closing argument that was made by one of the lawyers for the co-defendant Frank Chambers. And it was that concern... So let me tell you something that I hope counsel will address because the government didn't really directly go at this and maybe that's because there wasn't an objection at trial. But as I read the closing argument, what defense counsel told the jury was, and you disagree with this characterization, you tell us, defense counsel said, basically these words, the trial court will instruct you on what North Carolina tells you is your duty as a juror and what the sentencing range is in this case. You're to apply the factors and choose within that sentencing range what you deem to be the appropriate sentence. And defense counsel's closing argument, unobjected to for whatever reason, said, well you the juror can nullify the trial court's instruction and ignore the sentencing range's higher end upon pain of eternal damnation. That's basically the argument the closing attorney made. So as I read the affidavits, the communication seems to be about whether or not the jurors are subject to eternal damnation if they follow the closing argument. But I'm not seeing anything in the affidavits that addresses the issue of what the jury is to decide. Well I guess my response to that is I don't think it has to be a communication specifically about what the jury has to decide. Although I would say that the real question is was there enough of a showing that there was an external communication about the case that would require not only the presumption of prejudice but at least an evidentiary hearing to ferret out precisely what was said and what impact it might have had. I mean we don't have to make 100% of the showing in the affidavits and statements. We have to make enough of a showing, as this court said in Fullwood, for there to be a serious question about the fundamental fairness given the external contact and at that point there should be an evidentiary hearing to, excuse my sort of colloquial statement, get to the bottom of the matter, which didn't happen here. We don't know precisely what Holly Jordan asked her pastor. We don't know precisely what her pastor told her. And we don't know what Holly Jordan then went into the jury room and related. And we need to know that. This court needs to know that. The state court or the district court needed to know that in order to resolve the troubling question as this court's language in Fullwood indicated was given rise by the situation. That said, it seems to me that if what is going on, I mean the ultimate question in the sentencing phase of a capital case is what are we going to do? Are we going to give the defendant life or are we going to give the defendant death? And the closing argument of the co-defendant's lawyer, according to several of the affidavits, troubled the jury considerably and Holly Jordan, because she or others were troubled, went to talk to her pastor about it, got some spiritual guidance of some sort and then brought it back to the jury room. You know, Mr. Barnes is entitled to confront the evidence against him. I mean, that's what's really going on in a what I call a jury misconduct case or an external communication case. I get to confront that evidence and I get 12 jurors, not 13. And that didn't happen here. Or at least there's enough of a specter it didn't happen. What difference does it make that you're here on habeas review under an AEDPA standard as opposed to a standard if we were here on direct appeal? And the NoVo review of the court determination is, was the state court's determination an unreasonable application of settled federal law? And as I tried to indicate at the beginning of the argument, I think the settled federal law is you cannot have third-party communications with the jury about the case and from all indications, that's what was going on here. She didn't call her pastor because they didn't have enough water in the jury room. She called her pastor because they were troubled about what sentence to impose, apparently because of the closing argument of the Code Defendant's Council. So it's about the case and it's about what the jury is supposed to do at the end of the sentencing deliberations. So you have an unreasonable application of settled federal law because there was a failure on the part of the state post-conviction court to recognize the serious nature of the external communication. There was a failure of the state post-conviction court to accord Mr. Barnes the presumption of prejudice that Fullwood says under U.S. Supreme Court law arises when you have an external communication. If we assume, for purposes of argument, you're correct on that point. Under AEDPA, there's a separate showing of prejudice. Whose burden is it to show that? It would be the petitioner's burden to show the absence of substantial and injurious effect after an evidentiary hearing so we know what we are dealing with in terms of measuring the prejudice. You don't have to show that now. No, I don't think, I do have to show it yet. And that's what you're asking for, an evidentiary hearing to have the opportunity to show a substantial and injurious effect? Is that what you're asking? Well, that's, I'm at least asking for that. In all candor with the court, I think the court could reverse and direct the district court to grant habeas for this reason. The respondent has had the opportunity in state post-conviction and federal court to come forward with something. And they haven't done that. I mean, this issue has been front and center throughout this litigation. There's not a scrap of anything brought forward by the respondent. If the shoe were on the other foot, and I was in this court and had failed to develop something that it was my responsibility to develop, I'd be held to a procedural default. So I think the court could grant, to direct the district court to grant habeas and order no sentencing here. But at the very least, we'd be satisfied with a remand for an evidentiary hearing because we ought to have the opportunity, as Fullwood explains, to get to the bottom of what the misconduct was, what the discussions were, what the jury heard after that external communication to be able to determine whether there was prejudice or not. So certainly at the very least, we would ask for an evidentiary hearing. Again, I think what this court needs to look at is a very small part of this record. But we do have a statement from the juror in question, Holly Jordan, which is on page 1898 of the joint appendix. We have an affidavit from the private investigator who talked to Ms. Jordan, who talked to the pastor, Reverend Lomax, who talked to three other jurors. His affidavit is in the record at pages 1892 and 1893 of the joint appendix. We have an affidavit from sitting juror Peacock, it's on page 1900 of the joint appendix. And an affidavit from one of the lawyers who was not representing Mr. Barnes but was helping with the investigation in post-conviction. And she interviewed Ms. Jordan, Reverend Lomax, and at least two or three other jurors. So there's significant evidence in a very small part of the record in this case that indicates there was an external communication and there was no presumption of prejudice. If you read the state post-conviction court's adjudication of this issue, which is about one paragraph long and is in the joint appendix on pages 1882 and 1883. One paragraph acknowledging that this evidence was out there and saying, well, the defendant loses. And no indication that there was a presumption of prejudice recorded and no evidentiary hearing conducted. Let's just say there's an evidentiary hearing. The evidence at that hearing is we were concerned that based on the closing arguments of the defense counsel that if we followed the instructions of the trial court, we would be damned for all eternity. That was the entirety of the evidence. Did you get relief at that point? No, because that would not be evidence of an external contact. But we have to... They had contact with the pastor on whether or not if they followed the court's instructions, they would be damned for all eternity. Well, you'd have an external contact. Now you know the substance of the external contact. I think if the external contact is, I talked to my pastor and he said we didn't have to worry about the co-defendant's closing argument, we would be able to show prejudice. Because there would be... the impact is... That's not the question I asked you. The question I asked you was if the evidence revealed that the sum and substance of the extraneous contact was that the jurors would not be damned if they followed the trial court's instructions to consider the sentencing range, would that be prejudicial? I think it potentially would. But we would need to know if that was all that was said, which is hard to me to believe that would be all that was said in this communication. And we would need to know what Holly Jordan's interpretation, what words she used to relate that to the jurors. And I think we would need to know sort of what the other jurors' understanding of that communication was to be able to really determine whether there was some sort of prejudicial effect. But again, you know, under Remmer, once we come forward with that, the burden's on the other side to overcome the presumption of prejudice. And that's what's never happened here. Is Mr. Barnes accorded the presumption of prejudice that Remmer says we're entitled to and Fullwood says we're entitled to. And once you have that, I mean, again, if you look at Fullwood, it's not a huge degree of difference between the substance of the communication here and at least the specter of what the communication was in this case, although we don't know. And Fullwood said, well, it's troubling enough that there needs to be an evidentiary hearing. And that didn't occur here. And at the very least, we'd ask this court to reverse the district court and directed an evidentiary hearing be held. Thank you. You've got time at rebuttal and we'll now hear from Mr. Babb. Mr. Babb, why don't you tell us why this petitioner isn't entitled to a hearing? Yes, sir, your honor. Yes, sir, your honor. Good morning. Under Columbia Penholster, if there is no, in the situation Penholster was in, there was no hearing. And the question the Supreme Court said was, under these circumstances, Penholster can satisfy the unreasonable application of 2254 D1 only by showing there was no reasonable basis for the California Supreme Court's decision. And I think the question is determined, was the North Carolina State Post-Conviction Court reasonable in its application, in its determination of the law? Was it an unreasonable application of Rimmer? Which I believe is the point here. There's one thing I would like to respond to. Your honor, you said, well, pointing out the inappropriateness of the argument, it was not objected to. It was objected to, and I'll admit it wasn't objected to when he really got going. But it was objected to at the beginning, where he started talking about, surely among one of you there's a true believer. Mr. Kennerly, the district attorney, objected, excuse me, and that's on page 1530 of the joint appendix. It was overruled, and then it was off to the races. Now, I think, I've never asked Bill Kennerly why he didn't object. It wasn't an issue, obviously, further. But I think there is indication from the actual information before this court, the jurors didn't like the argument. I don't believe the characterization that the jurors had trouble imposing the death penalty is supported by the unsworn statements. The juror affidavit, the investigator affidavit, or the interviews. What we do know from that evidence... I'm going to interrupt you for a second. Yes, sir. I meant to ask the opposing counsel this question being answered on rebuttal if he disagrees with you. It wasn't clear from the record if the, I think there are four affidavits that are in our record that were before the magistrate and the district court. Were those, the affidavit, were all of those before the state MAR court? Was that the evidence there? Yes, sir. I believe, and I think that's shown by the affidavits. I think the way they're in the joint appendix is our, as exhibits to the motion for appropriate relief to state court. But I believe that they were all before the state court and I would be surprised if the answer was different from counsel. What evidence did the government, did the state offer to refute those affidavits at the MAR? No evidence, your honor. And none was needed because of the questions, well the basis behind the questions by Judge Adgee and Thacker earlier. It wasn't a matter before the jury. But just to expand on that a little bit, there was an evidentiary hearing in this case. Well the matter before the jury was whether or not to impose the death penalty and that's what the extraneous communications were about. Doesn't that, those communications go specifically to the heart of what the jury was there trying to do? No ma'am, I don't, I don't agree with that. Yes, the ultimate, I want to be more precise. Yes, the ultimate question is whether to impose the death penalty. I think as this court has said about the applying of aggravators and mitigators is what the jury is doing. The argument that bothered the jurors made the matter whatever, how it was characterized in the information, was the eternal damnation salvation that Judge Adgee has talked about earlier. And there is information in the affidavit that at least one juror, juror Weddington recalled that a juror read a passage from the Bible to another juror who was having a hard time with the death penalty. And the passage that was read, again we're putting it together because. Because you don't know the passage that was read do you? Well, and we don't know exact scripture, but we know the general thrust of it. It was a passage of a Christian's duty to follow the laws of the state. Now what we do know is that Ms. Jordan did contact Reverend Lomax. She did read a passage to the jury as your Honor just said. Reverend Lomax who was interviewed by a defense investigator does not remember ever talking to her. But says I surely could have, but I don't remember it. Ms. Jordan doesn't remember the exact passage, but she says it was on a Christian's duty to follow the law. And she said in her unsworn statement that she knew the passage from church. But the passage in question, a Christian's duty to follow the law, that again would relate to the improper jury argument about salvation or damnation, which I don't believe is before the jury in determining whether these three defendants receive the death penalty or not. The argument that if you don't vote the way I want you to, you risk your soul is not proper. And this communication with Reverend Lomax, the passage is not one that says an eye for an eye, which this court has found not to be in and of itself objectionable in other situations. But it wasn't calling for mercy or severity. It was saying follow the law, and the law was either give life or death. Now, the state MAR court did not have an evidentiary hearing on this claim. They had evidentiary hearing on other claims. There were over 20 claims involved. It would appear that the state MAR court made a factual error in that if I'm recalling its opinion correctly, it said there was no new evidence from what had appeared before the North Carolina Supreme Court in the direct appeal. But I'm thinking that that was incorrect because the affidavits that we have here were not before the North Carolina Supreme Court at the time. Is that correct? Yes and no, Your Honor. They weren't before the Supreme Court, but the MAR court didn't say there is no new evidence. The MAR court in its ruling said the allegedly new evidence adds nothing to the issue as it was presented during defendant's initial appeal, and the allegations are subject to the same analysis inherent in that decision. If we determined that that was factually incorrect, that the affidavits contained some new information that was not on the direct appeal trial record, what difference does that make? Well, Your Honor, I'm not trying to beg your question, but he doesn't say it's not new evidence. He says it adds nothing to the issue. Right, but if these affidavits, and maybe that's the answer, but the affidavits appear to be more expansive than the dialogue that occurred before the trial court in the trial. Well, they are more expansive, but the state court was absolutely correct that they didn't add anything because what was before, the question the trial judge asked was, is there any evidence that they did discuss the facts of this case or particular facts of this case? And the answer was there's no evidence they did or did not. But no evidence they did, no, no, sir, no evidence they did. There was nothing that was added to the, that would give you that matter before the jury language that's in Rimmer. And Rimmer does say, as the court pointed out, that it has to be a matter pending before the jury. Assume that we find that it was a matter pending before the jury. In Rimmer, the court also ordered a hearing because it did not know from the record, nor did the petitioner know what actually transpired or whether the incidents that may have occurred were harmful or harmless. Isn't that the exact situation we have here? Assuming we find that this was a matter before the jury. No, ma'am. And why not? Because the question isn't whether you find that it was a matter before the jury. The question is whether you find that it was an unreasonable determination that it was not before the jury. And that simply is, I just can't see that being supported. Okay, assuming we find that it was an unreasonable determination that it was not before the jury. Well, if you find it's unreasonable, then petitioner, if you find an unreasonable application, then you get to do an FOA review if there's correct error as well. Right. But I just can't, well, I would submit that there's, it's not, it would be very unreasonable. I mean, it would not, it cannot be unreasonable application of Rimmer where the matter's not even before the jury in the first place. And also. How can you say that? The death penalty is before the jury, and that's what they're talking about. No, actually, what the, yes, sir, your honor, the death penalty was before the jury, but what the argument was talking about was you're going to lose your eternal salvation or be damned for eternity if you don't vote my way. That isn't an aggravator or mitigator, and that's not properly before the jury. So if the, because the juror didn't, the one thing that's been characterized, and the district court points this out in its excellent order, the reverend was not a second or third prosecutor or whatever he's referred to in Petitioner's Brief. He wasn't a 13th juror. There's no evidence at all that he advocated for life or death. The passage in question. That's the point, because there wasn't a hearing to find out actually what went on. But they talked to the reverend, and he said he didn't recall. Well, you know, that factual issue that Judge Agee raised is pretty significant for this reason. The Supreme Court used language that it was just a mere unsubstantiated allegation. That's a finding by the Supreme Court. Yes, but this court's reviewing the state post-commission court, which found it to be without merit. I understand that. Well, yes, sir, I'm sorry. But the MAR court essentially did the same thing. Well, but regardless of what the MAR court did or said and didn't mention Rimmer specifically, this court would have to find, looking at the result of the MAR court, that it was an unreasonable application of Rimmer to find that the juror's eternal salvation was not a matter before the jury. And I just don't think that's possible. Also, Rimmer, if you look at Rimmer, yes, there was a hearing, but Rimmer was a third party contacting a juror about a bribe. The FBI investigated the case during the trial, and they never told a defendant about it. And also, I just have to say, on the Fulwood, counsel argued that Fulwood is not a huge degree of difference with here. But in Fulwood, one juror was influenced by her husband who kept telling her to vote for death, and also the jury was aware Fulwood had already been sentenced to death and it was reversed on a technicality. Well, first off, it's not a U.S. Supreme Court case, so it wouldn't be fully established law, but it's nowhere near similar to the facts we have here. If we assume there was a finding here of an unreasonable application, where it was established in the Supreme Court, assume for purposes of argument, under ADPA, is that the end of it, or is there anything further that the petitioner needed to show? The petitioner would also need to show, Your Honor, I believe as you questioned earlier, a substantial injurious effect on the verdict. And even if we were looking at that, and I'm in no way conceding that this was an unreasonable application of law because I just can't see how it could possibly be, but if we're just looking at injurious effect, the verse in question is a Christian's duty to follow the laws of the state. It doesn't say anything about punishment or mercy. It doesn't affect, it doesn't go to a mitigator or aggravator. It's talking about the juror, it's not talking about the defendant. That is not a showing of a substantial injurious effect on a verdict. Now, the state post and convention court decided this claim on the merits. Well, if we were here on direct appeal, would the issue be different? If we were here on direct appeal and we didn't have these unsworn statements? Well, let's assume we're here on direct appeal and these affidavits were indirect. How about this? We're here and ADPA doesn't apply? Yes. And I'm not trying to be flippant. Again, I just don't see how there's any injury to defend it because for a defendant to prevail and say this matters before the jury, it is the functional equivalent of saying I get the benefit of this improper argument of telling the jury they're going to lose their salvation if they don't vote my way and then if anyone reacts to that and looks at the Bible or calls a preacher about that, that's just not part of what's going on in the jury's determination of that person, these defendants, these three defendants, two of which got the death penalty, one did not, these three defendants whether they get life or death. The jury decided two of them, the most culpable, which this defendant was one of, received death and the third received life. But their salvation was not a matter before them. Where is it in the record that Ms. Jordan said that the passage was about following the laws of the state? It is in the unsworn statement that the defendant submitted. It's on 1898 of the joint appendix. I apologize. And she says she read an unspecified passage from the Bible stating it's the duty of Christians to abide by the laws of the state. Now, some of the other affidavits refer to Bible but they don't passage, but they don't refer to a specific passage. And the one affidavit from a juror does not say anything about being hesitant to impose the death penalty. It says that the argument made the jury furious, which simply enough might be why the district attorney didn't object to it. Didn't Juror Weddington say that one of the jurors was having a hard time with the death penalty? Well, that is written down. Yes, ma'am. I guess what I'm trying to say is the only affidavit from a juror. There is these juror interview notes that are unsworn and unsigned, but in terms of the only affidavit from a juror. And unrebutted. Yes, unrebutted. And, again, the state, you know, the argument that if the state has to come forward and present something just turns this whole process on its head. That's not the case. If the state doesn't come forward unless the defendant meets their burden, in this situation, again, Rimmer just can't apply because it's not a matter before the jury. And even if this court were to somehow disagree with that, it would not be enough for relief. You'd have to find it to be an unreasonable application for the state court to not apply a presumption. And based on the other cases, especially where, you know, under AEDPA, as the Supreme Court said in Carey v. Musdallin, where there's a lack of cases specifically addressing a ground for relief, it cannot be said the state unreasonably applied a clearly established federal law. There are other juror communication cases, Smith v. Phillips, Parker v. Gladden, Maddox v. U.S., Rimmer v. U.S. from the Supreme Court, but none involve a... What if a juror had called her pastor because one of the other jurors wanted to impose the death penalty and the juror who called her pastor did not, and the passage that they read to the juror was, Thou shalt not kill. Would the state feel the same way? That that's not a matter before the jury? Well, the state wouldn't have any recourse because if the state laws were stuck, that's not a level playing field. But in terms of just the academic answer to that question, that verse would be different except for the fact that this court's already said that an eye for an eye. I mean, who doesn't know, Thou shalt not kill the Ten Commandments in Rohan County, North Carolina? I think that would be an internal lie, and this court's found the same. The state might not like it if a juror decides that they can't apply the death penalty, and maybe they didn't question them enough in voir dire, but no, I don't think that would add to the argument for this court here. I'm sorry, did I answer that question, Your Honor? I rambled a little bit. I apologize. One second, Your Honors. I also want to just briefly say that, just to follow up on the Kerry reference, the Nevada reference, the cases, if you look at the Supreme Court cases I just mentioned, none of them are close to what we have here. Even in the very old one from 1892, the bailiff told the jurors, this is the third murder he's done. Parker v. Gladden, that's a wicked fellow, and by the way, if y'all make any mistakes, the state Supreme Court will fix it, don't worry. But then Smith v. Phillips, the juror applied for a job with the DA, it wasn't disclosed until after trial, they found no error. Of course, all those cases are pre-EDPA, and none of that presumption applies in habeas. But just looking at the application, this court cannot find that it was an unreasonable application for the state's MAR court to deny the defendant's claim. Thank you. Thank you very much, Mr. Babb. Mr. Wittenhouse, you've got some remaining time. May it please the Court, just several points in rebuttal. First, with regard to the question about whether the affidavits that were presented to the district court were presented to the state court, undoubtedly there were. We did not include the various motions for appropriate relief and attachments in the joint appendix, but they're in the district court record and we can get them for the court if the court needs it. But if you look at the district court opinion, particularly pages 2140 and 2141, and the long footnote 10 of the district court opinion, it indicates that it's relying on these affidavits that all have been presented to the state post-conviction court. And with regard to the affidavits, I think it's very important for the court to keep in mind that Investigator Williams' affidavit refers to Jewel Weddington and says that Jewel Weddington specifically said that one of the other Jewelers was hesitant about returning the death sentence and at that point, that was when the communication between Ms. Jordan and her pastor occurred. We, of course, don't know the precise four corners of that communication, which is why we need an evidentiary hearing. But there is no doubt that the record shows one of the Jewelers was hesitant about imposing the death sentence and the closing argument was a part of that consideration and that certainly is a matter that was before the sentencing jury. Secondly, with regard to Mr. Babb's suggestion that there was an objection at some point to this closing argument, that is a strained reading of this record. The place where the objection occurs is on page 1529 of the joint appendix. If we know what the allegedly improper closing argument was about eternal damnation, that doesn't occur on page 1532 of the joint appendix. So you have three or four pages of closing argument from the objection, that doesn't have anything to do with this argument, to the place where the argument occurs where there is no objection. So clearly this is an unobjected to closing argument of the other co-defendants' counsel to the extent that makes any difference. I honestly don't think it does. I'm sorry? I said it's in, so whether it should have come in or not. And the third, with regard to whether this is... What about the fact that the affidavits do also show that it was the argument that the jurors were concerned with,  that that was the matter that was before the jury? Because the argument is about what sentence should be imposed in the case. It sounds to me like the state is almost saying if it's a closing argument question, that's not before the sentencing jury. And that's essentially what the district court's finding. Well, arguments of counsel aren't evidence. No, but they are matters before the jury. The jury considers everything they hear in the courtroom unless the trial court says, strike that from the record, and the jury is instructed to disregard it. So this was clearly something before the jury. And finally, as my time is running out, I think the substantial and injurious effect we at least have here under Fullwood is the failure to be accorded the presumption of prejudice. And as Fullwood said, when you have these troubling allegations, you have to have a hearing. Thank you very much, Mr Woodhouse.
judges: G. Steven Agee, Henry F. Floyd, Stephanie D. Thacker